**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**Jacksonville Division**

| | |
|---|---|
| **FERMIN ALDABE** | ) |
| **Plaintiff** | ) |
| | ) **Civil Action No.:** |
| **vs.** | ) |
| | ) |
| **ENVIRONMENTAL SERVICES, INC** | ) |
| | ) |
| **and** | ) |
| | ) |
| **ONEBEACON INSURANCE GROUP LLC** | ) |
| **Defendants** | ) |

_____

**COMPLAINT**

**Demand for a Jury Trial**

_____

    **FERMIN ALDABE** (**Aldabe**) alleges for this complaint against

**ENVIRONMENTAL SERVICES INC (ESI)** and **ONEBEACON**

**INSURANCE GROUP LLC (Insurer)** as follows:

**PARTIES AND JURISDICTION**

1. Plaintiff Aldabe is an individual domiciled in Estatoe Township, North Carolina.

2. Defendant ESI is a corporation formed under the laws of Florida domiciled in Jacksonville Florida.

3. Defendant Insurer is a corporation formed under the laws of Minnesota domiciled in Plymouth, Minnesota.

4. This Court has subject matter jurisdiction over the case under Title 28 U.S.C. § 1332 as there is complete diversity between Plaintiff and Defendants and the claims at issue exceed $75,000.

5. This Court has general jurisdiction over Defendant ESI because it is domiciled in Jacksonville, Florida.

6. This Court has specific jurisdiction over Insurer because it acted in Florida through agents (ESI's counsel) to interfere with Aldabe's contractual relationship with ESI.

**BACKGROUND FACTS**

7. Aldabe approached ESI on or about early December 2011 to certify a reduced emissions carbon forestry project under ISO 14065 and the VCS Standard. On 8 December 2011 ESI sent an offer letter and contract listing the

2

validation/verification team.  Aldabe relied on this representation as allowed under § 8.2 of ISO 14065 to conclude that said team and leader met the conditions precedent §§ 6.3.3 and 6.3.7 of ISO 14065 (see below).

8. Aldabe relied on said representation to enter a contract with ESI (Annex A hereto incorporated into this complaint) which received pecuniary benefit in return.  As validation and verification body (**VVB**), ESI would certify Aldabe's carbon forestry project located in Beni, Bolivia under the VCS Standard (**project 1**).  Project 1 contract terminates on 19 October 2041 when the project lasting 30 years ends.

9. The certificates are fungible into carbon credits that can be traded in VCS Registries approved by the VCS association (**VCSA aka Verra**) which owns and administers the VCS Standard.

10. The contract identifies Aldabe as sole client and only beneficiary to the certificates (aka **GHG Assertion**) issued by ESI and to the professional liability policy (**policy**) issued by Insurer for ESI's errors and omission covering up to $5,000,000 worth of damages.

11. The contract identifies ESI as the sole arbitrator to determine whether project 1 meets the VCS Standard.  Specifically, whether Aldabe's ownership scheme needed to own the credits produced by project 1 meets the VCS Standard.  To do so, requires possession of an ISO 14065 and a VCS Standard license to certify carbon emissions projects.

12. The contract evolves in rounds where ESI sends Aldabe a list of findings he needs to address to meet the VCS Standard and Aldabe responds doing whatever he wants to meet it, including: creating or amending contracts, changing the project proponents in the project description (**PD**).

13. Under the contract, both the PD and sampling plan are living documents and subject to change as circumstances change until the PD is submitted to the VCS Registry.  The PD becomes a contract between Aldabe and the VCS Registry only after he signs and submits to the VCS Registry the registration deed of representation along with ESI's certificates and PD.

14. The contract incorporates the VCS Standard (a set of documents), the ISO 14064-3 and ISO 14065.  ISO 14065 states in its introduction: "**The overall aim of GHG validation or verification activities is to give confidence to all parties that rely upon a GHG assertion.** The party making the GHG assertion is responsible for conformity with requirements of the relevant standard or GHG programme. The validation or verification body is responsible for completing an objective assessment **and providing a validation or verification statement concerning the responsible party's GHG assertion based on evidence.**"[1]

15. ISO 14064-3 impose the following duties on ESI:

---

1    Aldabe uses bold letters to aid the Court by highlighting key passages/words.

4

a. Under § 3.3 of ISO 14064-3: *Demonstrate **ethical conduct through trust**, **integrity**, confidentiality and discretion throughout the validation or verification process.*

b. Under § 3.4 of the ISO 14064-3: ***Reflect truthfully and accurately** validation or verification activities, **findings**, **conclusions** and reports. Report significant obstacles encountered during the validation or verification process, as well as unresolved, **diverging opinions among validators or verifiers**, the responsible party and the client.*

c. Under § 3.5 of ISO 14064-3: *Exercise due professional care and judgment in accordance with the importance of the task performed and the confidence placed by clients and intended users. **Have the necessary skills and competences** to undertake the validation or verification.*

16. Under ISO 14065, ESI owes duties

a. Under § 4.3 Competence: *Personnel have the necessary skills, experience, supporting infrastructure and capacity to effectively complete validation or verification activities.*

b. Under § 4.5 of ISO 14065: ***Timely information about the status of the validation** or verification is accessible or disclosed appropriately to intended users, the client or responsible party.*

c.  Under § 5.2 Legal and contractual matters: *The validation or verification body shall be a legal entity, or a defined part of a legal entity, such that* **it can be held legally responsible for all its validation or verification activities.** *The validation or verification body* **shall have a legally enforceable agreement with each client for the provision of validation or verification services**. *The validation or verification body shall retain authority and* **responsibility for its validation or verification activities**, *decisions and validation or verification statements.*

d.  Under § 6.3.3 of ISO 14065: **The validation or verification team shall have expertise to evaluate** *the implications of financial, operational,* **contractual or other agreements that may affect GHG project** *or organization boundaries,* **including any legal requirements related to the GHG assertion**.

e.  Under § 6.3.7 of ISO 14065: *The validation or verification team leader shall have a) sufficient knowledge and expertise of the competencies detailed in 6.3.2,* **6.3.3**, *6.3.4, 6.3.5 and 6.3.6 (as appropriate) to manage the validation or verification team in order to meet the validation or verification objectives,…*

f.  Under §§ 6.4 and 6.6, ESI can subcontract or outsource to preserve impartiality so long as it retains liability for the GHG Assertion.

g. Under *§ 7.1 of ISO 14065: The validation or verification body shall provide the following to its client or responsible party: … b) **changes to the validation or verification requirements and the relevant GHG programme that may affect the objectives of the client**; d) **relevant information on validation or verification team members**...*"

h. Under § 8.2 Pre-engagement:

1. § 8.2.2 Competence:_ ***The validation or verification body shall review information received from prospective clients to determine if the validation or verification body has the competence, personnel*** *and resources necessary to successfully complete the prospective assignment in accordance with the r**equirements of Clause 6**.*

2. § 8.2.3 Agreement: *The validation or verification body shall have a legally enforceable agreement with the client in accordance with the requirements of 5.2. The contract between the validation or verification body and the client shall take account of the requirements of ISO 14064-3:2006, 4.3.*

3. § 8.2.4 Appointing the **team leader**: *The validation or verification body shall appoint the validation or verification team leader in accordance with the **requirements of 6.3.7**.*

17. Under §3.3.2 of the Validation and Verification Manual incorporated through the VCS Standard, ESI owed duty to Aldabe: *All identified discrepancies and areas for clarification must be **clearly communicated to the project proponent**, addressed and transparently documented*.

18. The VCS Standard contains the following:

    a. Under §3 (Project Requirements), §3.11 (Ownership and Other Programs), specifically **§3.11.1 (Right of Use)**: *The PD shall be accompanied by **documentary evidence** establishing conclusively one or more of the following rights of use (see VCS document Program Definitions for definition of right of use) accorded to the project proponent(s)….2) A right of use arising under law….4) A right of use arising by virtue of a statutory, property or contractual right in the land,….*

    b. Under § 5 Validation and Verification Requirements, § 5.3.4: *Where the project does not meet the criteria for validation or verification, the validation/verification body shall produce a negative validation conclusion and provide the validation, or verification, report and PD, or monitoring report to the VCSA. The project shall be ineligible for registration until such time as corrective action is taken and the **(same)** validation/ verification body has provided a positive validation or verification.*

19. The VCS Standard also incorporates the following definitions:

a. **Project Proponent**: "***The individual*** *or organization that has overall control and responsibility for the project, or an individual or organization that **together with others**, each of which is also a project proponent, **has overall control or responsibility** for the project*."   It allows many and distinguishes between those with control and those with management responsibility.

b. **Right of Use**: "*In respect of a GHG emission reduction or removal, the unconditional, undisputed and **unencumbered ability to claim that the relevant project**, or jurisdictional REDD+ program, **will** or did generate or **cause such reduction** or removal*."   In plain language the real power, rather than formal power, to guarantee the project has and can keep permanent for 30 years the forest backing the credits.

c. **Proof or Right**: ***The document(s)** demonstrating the entity's right to all and any GHG emission reductions or removals generated by the project or program during the crediting period or verification period, as the case may be. Distinct from right of use.*

20. Task 4 of the contract states: "***Critical Issues or Omissions*** *Any critical issues or omissions of necessary data discovered during **(or after) the validation/verification process outlined in Task 1, 2 or 3**, will be billed at $150 per hour*."   This task ensures that buyers of credits produced in

2040 and who rely on ESI's validation report and validation deed of representations get what they paid for: credits backed by the carbon stored in the forest.  Today, the Duval Circuit Court order[2] dismissing the complaint means that the credits Aldabe sold to the World Expo are worthless because ESI failed to properly evaluate Aldabe's project 1 ownership scheme.  Under Task 4, ESI had a duty to timely rectify the situation by triggering Task 4 and notify Aldabe of the specific deficiency that ESI expects Aldabe's to address. In reality, the Duval order requires every VVB to reopen any closed § 3.11.1 findings in every project that used land titles issued by national governments or their dependencies.

21. To meet conditions precedent § 8.2.2 of ISO 14065, Aldabe submitted to ESI a project description (PD).  As required he described how he satisfied § 3.11.1 (right of use) to claim the project 1 credits: "A right of use arising under law. Total area of property is 500has and it completely includes the [project 1 site]. **Palma Efuus SRL has purchased the property from deforestation agent. Palma Efuus is a company owned by the project proponent.**"  The PD further lists 2 documents to prove "Ownership: 1. Right of use arising by virtue of a contractual right in the land. 2. A right of use arising under law."

_____

2   See below.  Finding that a land registry certificate issued by a UN recognized national government does not meet § 3.11.1 (right of use).

22. He also submitted a shareholder certificate issued by the Bolivian Company Registry showing Aldabe controlled Palma Efuus SRL with 99% of its shares and which at all times acted as Aldabe's agent.

23. Prior to the project 1 site visit, ESI queried Aldabe: "Please reference the exact document that demonstrates you currently own the property." Aldabe responded "I have a purchase agreement between deforestation agent and Palma Efuus. For tax reasons I own 99% of Palma Efuus [(SRL)]. Section 1.12.1 of PDD addresses this issue." ESI replied "I would like to see evidence that Palma Efuus SRL owns the property and rights to the carbon".

24. As requested, Aldabe submitted the project 1 INRA Certificate to ESI during the project 1 site visit.  In Round 1 ESI approved Aldabe's ownership scheme when it did not raise a § 3.11.1 finding or its verification equivalent.

25. On 26 March 2012, ESI issued the project 1 validation report certifying project 1 and a validation deed of representation signed by McMahon stating "All information which I have provided in the Validation Report is true and accurate in all material respects." The report states:

    a. Under Summary: ***Fermin Aldabe (project proponent) owns the property,*** *developed the project and conducted the technical analysis.*

b. Under § 3.1.9 Right of Use: *The property is owned in fee simple ownership under the laws of Bolivia. Titles have been produced and reviewed by the auditors while on site*.

c. Under § 3.1.14 Eligibility criteria for grouped projects: *Ownership: 1. Right of use arising by virtue of a contractual right in the land. 2. A right of use arising under law.*

d. Under § 3.2.2 Applicability: *project proponents can show ownership of the project site **and** ownership of the carbon rights for the project area;*

26. On 26 March 2012, ESI issued the project 1 verification report certifying project 1 and a verification deed of representation signed by team leader McMahon stating "All information which I have provided in the Verification Report is true and accurate in all material respects."  The report states:

a. Under Summary: *Fermin **Aldabe (Project Proponent) owns the property**, developed the project and conducted the technical analysis.*

b. Under § 3.2 Document Review: *Documents reviewed include land ownership documentation…*

c. Under § 3.4 Site Inspections: *During the site inspections, ESI assessed the following items:...project documents including ownership evidence, ownership records of deforestation agent,...*

27. Neither of these reports mention Palma Efuus SRL.

28. Had ESI raised a finding under § 3.11.1 and required a written contract between Aldabe and his agent Palma Efuus SRL, Aldabe would have addressed it. He would have submitted the necessary contract by directing his agent and its CEO, H Padilla Melgar, to sign it.  But ESI found it unnecessary because the shareholder certificate was sufficient to show that Aldabe could do so, had a perfect meeting of the mind with Palma Efuus SRL, the unencumbered ability to burn to a crisp the forest backing the project 1 credits and thus was the only individual or entity that had the unencumbered ability to ensure the permanence of the credits for the duration of the project.

29. As sole arbitrator, ESI set the precedent that the word *control* used to define project proponent within the meaning of § 3.11.1 is to be interpreted as those persons that have real power. Not those acting as proxies/agents which have only formal power[3].  Otherwise, ESI had the duty under the contract to require Aldabe to submit a written contract between Palma Efuus SRL and Aldabe ceding the forest rights backing the credits.

---

3   The alternative is an invitation to fraud.

30. Staring 26 March 2012 and for 30 years or until retracted under Task 4, Aldabe had the right to rely[4] on ESI representation that his ownership scheme met the VCS Standard. During that same period, ESI had a duty to timely trigger Task 4 any time it found said representation to be false.

31. Aldabe relied on said representation which ESI never thereafter retracted. As a result, Aldabe concluded that his project 1 ownership scheme met § 3.11.1 of the VCS Standard. He further concluded that an ownership scheme meets said criterium whenever it is made of a project site land title in favor of a company and a shareholder certificate showing he owns said company. He also concluded that he could serialize/copy and paste/carbon copy/clone said scheme to any carbon forestry project; He concluded so based on this VCS precedent which ESI found preserved the integrity of the credits (a pillar of the VCS Standard).

32. Aldabe submitted the certificates to the VCS Registry which approved them and allowed Aldabe to register project 1 with the VCS Registry. But only after Aldabe submitted a contract requested by said Registry between project proponent Aldabe and Redd Services Pte Ltd, holder of the VCS Registry account 1009. Redd Services Pte Ltd was Aldabe's agent, was owned by his agent Palma Efuus SRL and manged by Aldabe as CEO. He signed the contract twice, once as individual and once as

---

4   Under §§ 3.3,3.4 of ISO 14064-3, §§ 4.5, 7.1, 8.2.2, 8.2.4 of ISO 14065 and § 3.3.2 of the Validation and Verification Manual.

CEO.  He also submitted the required signed Registration Deed of Representation accepting liability for any misrepresentations made in the PD.  As a result project 1 was registered with the VCS Registry.

33. Later, ESI triggered Task 4 on June 2013 because the credits had lost their integrity, well after ESI had issued the certificates on March 2012.  ESI withdrew its verification statement from the VCS Registry because verification had been premature.  ESI clearly and timely notified Aldabe the withdrawal and the supporting reasons in order to comply with §§4.5, 7.1 of ISO 14065 and § 3.3.2 of the Validation and Verification Manual. Simultaneously, it triggered Task 4.

34. ESI's lapse was addressed on June 2013 under Task 4 of the contract **after** the certification was granted back on 26 March 2012 and Aldabe had registered the project with the VCS Registry.   ESI did so because it owed duty to Aldabe to ensure the credits' integrity through 2041.

35. To re-verify project 1, Aldabe amended his project 1 monitoring report[5] to list Redd Services Pte Ltd as the managerial project proponent.  ESI granted certification again on 7 June 2013.  But only after it requested documentary evidence showing the relationship between Aldabe and Redd Services.  Aldabe submitted a Singapore Company Registry

---

5   The PD is addressed during validation and the monitoring report is addressed during verification.

certificate showing Aldabe controlled Redd Services Pte Ltd as CEO and that his agent **Palma Efuus SRL owned all its shares**.

36. Nevertheless, on 7 June 2013, ESI issued the project 1 re-verification report certifying project 1 and a re-verification deed of representation signed by McMahon stating  "All information which I have provided in the Verification Report is true and accurate in all material respects."  The report states:

   a.  Under Summary: Redd Services Pte Ltd (Project Proponent) owns the property, developed the project and conducted the technical analysis.

   b.  Under § 3.3 Interviews:  *Fermin Aldabe – Project Proponent- **owner of Redd Services Pte Ltd***.

   c.  Under § 3.2 Document Review: *Documents reviewed include land ownership documentation,…*

   d.  Under § 3.4 Site Inspections: *During the site inspections, ESI assessed the following items:… project documents including ownership evidence...*

37. Aldabe relied on these representations which ESI never retracted.  As a result, he concluded that ESI set the precedent that one must look at who has the real power to burn the forest down in order to ensure the integrity of the credits instead of his agents.  Only Aldabe could call a shareholder meeting and only with his vote could the forest be deleted.

38. Aldabe re-registered the project in the VCS Registry with account 1009 in the name of his agent Redd Services Pte Ltd. Aldabe had a written contract with Redd Services Pte Ltd to get paid $10/credit he delivered to it or its successors. Not just for project 1 credits but for any credits he delivered for any project registered in any VCS Registry.

39. Said contract dated 25 April 2012 states: "2. In exchange for the Property [(**project 1** credits)], the [Aldabe's agent] agrees to pay to [Aldabe] the sum of USD10 for **every** Verified Carbon Unit [(carbon credits)] that is registered in **any approved VCS registry**...5. This agreement shall be binding upon the parties, and **upon their heirs**, executors, personal representatives, administrators and assigns."[6]

40. It purposely rendered Redd Services his brokering agent because when Aldabe delivered the credits, Redd Services lacked assets to pay.

41. Under the VCS Standard, a project can only have 1 nominated VCS registry. Aldabe intended at the time of signing that said contract would do away with unnecessary future bureaucracy during registration of project 1 clones; something the VCS Registry administrator confirmed to him with its own intent to keep paperwork to a minimum.

42. Later, on November 2015, Aldabe issued 20,000 credits and sold them to the 2015 World Expo held in Milan to offset its emissions at the trough of

---

6   Heirs include Palma Efuus SRL and Palma Efuus LTD which took control of VCS
    Registry account with APX, number 1009, on April 2013 and January 2016 respectively.

$4.75/credit owned by account 1009 holder Palma Efuus SRL and brokered by Palma Efuus LTD.  Today, those credits are worthless and the Expo did not get its bargain that now has a replacement value of $10/credit.

43. Aldabe designed project 1 to get his *feet wet* before cloning it into larger projects without surprises.  Project 1 was also his canary in the shaft, a necessary step to any macro trade; something he learned during his spell in the hedge fund industry as quantitative analyst.

44. At all times Aldabe intended for all other projects to be project 1 clones such as to quickly serialize and save ever more forest from destruction.

45. On 5 July 2012 Aldabe started cloning when he bought project 2 site located in Pando Bolivia from deforestation agent, Nelly Lazo Holkon, again through his agent Palma Efuus SRL.  He financed the purchase through a bridge loan to asset-less Redd Services.

46. To develop the project, Aldabe relied on the representations made in the project 1 validation and verification reports to clone project 1 ownership scheme into project 2 ownership scheme.

47. Relying on both representations ESI made in two project 1 reports and the absence of a Task 4 retraction, Aldabe approached ESI to certify project 2 on or about 22 August 2012.

48. To avoid surprises, he first discussed with ESI his seemingly aggressive but sound sampling strategy. Using Aldabe's spreadsheets, ESI confirmed it sound, as it would do until Round 6 iteration of findings and responses. ESI concluded that the sampling strategy compensated by using larger plots that yielded a standard deviation of %15 as promised in the PD. Team leader McMahon participated in said analysis.

49. ESI quoted for validation and verification on 24 October 2012. Aldabe bargained on the basis project 2 was a *carbon copy* of project 1. ESI agreed internally and sent a new quote on 9 November 2012.  Aldabe relied on this representation by conduct to conclude that project 2 was a project 1 clone.

50. As he had done with project 1 offer letter, Aldabe also relied on ESI's project 2 offer letter dated 9 November 2012 listing the team and leader to certify project 2, as envisioned in § 8.2 ISO 14065.  As a result he concluded that ESI's team and leader met conditions precedent §§ 6.3.3 and 6.3.7 of ISO 14065 necessary to evaluate whether his ownership scheme met the VCS Standard and in turn to decide to hire ESI to certify his project 2.

51. On 8 January 2013, Aldabe agreed to ESI's terms similar to those made in project 1 contract (Annex B hereto incorporated into this complaint).  The contract terminates on 1 August 2042.  Task 3 of the contract states: "Any

critical issues or omissions of necessary data discovered **during (or after)** the validation/verification process outlined in Task 1, 2 or 3, will be billed at $150 per hour."

52. Aldabe is sole client and beneficiary of the project 2 certificates as well as the professional liability policy covering damages up to $5,000,000. Again, ESI was sole arbitrator to evaluate whether Aldabe's ownership scheme met the VCS Standard.

53. It incorporated the ISO 14065, ISO 14064-3 and same VCS Program documents.  Some of the latter had updated criteria.

54. Specifically, § 5.2.3 of the VCS Standard: *The project shall be **listed on the project pipeline before the opening meeting*** *between the validation/verification body and the project proponent (**such opening meeting representing the beginning of the validation process**).  The validation/verification body is responsible for checking that the project is listed on the project pipeline and **shall not conduct the opening meeting or otherwise begin validation until such time as the project is listed.***

55. Under § 3.1.4 of the Registration and Issuance Process v3.6, to pipeline register a project one must submit to VCS Registry: 1) a contract with the VVB, a 2) PD detailing the ownership scheme and 3) a unilaterally signed self declaration form known as **Listing Representation**.

56. As in project 1, under §§ 6.4 and 6.6 of ISO 14065 incorporated into the contract, ESI could subcontract or outsource to preserve impartiality so long as it retains liability for the GHG Assertion so as to comply with § 5.3.4 of the VCS Standard requiring the **same** VVB to close any findings opened by said VVB.

57. As with project 1 contract, both the PD and sampling plan are living documents and subject to change as circumstances change until the PD is submitted to the VCS Registry. Aldabe could again, as he wished, amend the PD and amend or supplement documentary evidence to meet § 3.11.1.

58. Again, under §§ 4.5, 7.1, 8.2.2, 8.2.4 of ISO 14065 and § 3.3.2 of the Validation and Verification Manual, Aldabe had the right to rely on any type of representation ESI made affecting project 2 staring on 9 November 2012 when ESI made the offer. Specifically, representations made by omissions such as not reopening a closed finding.

59. To obtain a quote, Aldabe submitted a project 2 description which declared Palma Efuus SRL the managerial project proponent. As in project 1 he noted in the PD that Palma Efuus SRL owned the project 2 site and that Aldabe owned Palma Efuus SRL.

60. Prior to the mandatory opening meeting Aldabe submitted a sales agreement (later mentioned in Round 7 validation report) for project 2 site in favor of Aldabe's agent Palma Efuus SRL. To assert his ownership

of the credits he also submitted the same shareholder certificate he had

submitted in project 1.

61. On 13 March 2013 ESI emailed Aldabe telling him that under § 5.2.3 he

had to pipeline-register his project before the validation opening meeting

could take place.  The next day, VCSA returned guidance to Aldabe,

which he forwarded to ESI the following day, stating that he could

grandfather project 2 if the opening meeting was held before 4 April 2013

because the VCS Standard Document Revision History stated that § 5.2.3

became effective starting on 4 April 2013.  Knowing so, on 18 March

2013, McMahon directed McMorrow to hold the opening meeting before

the 4th of April in order to grandfather project 2 under §5.2.3.

62. The opening meeting was held on 25 March 2013. The following day ESI

issued the project 2 sampling plan without any mention of agent Palma

Efuus SRL and listing Aldabe as only project proponent on page 1.

Aldabe relied on said representation to conclude that his project 1 and 2

ownership schemes met the VCS Standard once ESI approved the

documentary evidence showing Palma Efuus SRL owned project 2 site.

63. In early April 2013, ESI's McMorrow[7] visited project 2 site in Pando

Bolivia and during discussions represented verbally to Aldabe across all

───────────────

7    As in project 1, McMorrow vetted the project to determine whether it met the VCS
     Standard.

three days that he was the project 1 and 2 project proponent and owner of their credits because his ownership scheme met the VCS Standard. Aldabe obsessively sought these representations because it is the most critical part of any project and wanted to ensure ESI could not backtrack without a proper explanation owed under the contracts.

64. At all times, staring with the project 1 site visit, McMorrow agreed with Aldabe because McMorrow had purchased property in Costa Rica for his own personal pleasure (control) using Aldabe's ownership scheme based on the law of agency.

65. Aldabe relied on these representations to conclude that his ownership scheme met the VCS Standard and that ESI was using a team and leader that met conditions precedent § 6.3.3 and § 6.3.7 of ISO 14065 necessary to evaluate whether Aldabe's project 1 and 2 ownership scheme met the VCS Standard.

66. ESI issued Round 1 without a § 3.11.1, but opened its carbon forestry verification equivalent Round 1 finding 68 (page 39) .  On 20 September 2013, ESI sent Round 2 to Aldabe which closed this finding while stating that Palma Efuus SRL owned the credits because it owned the project 2 site. On 18 December 2013 ESI issued Round 5 confirming only 1 finding remained; a quantification finding unrelated to § 3.11.1.   ESI

never reopened a § 3.11.1 finding or finding 68 Between 20 September

2013 and until 10 August 2023, either for project 1 or for project 2.

67. At all times up and until 10 August 2023, Aldabe relied on these

representations and the absence of a project 2 Task 3 notice or a project 1

Task 4 notice to conclude that his ownership scheme met the VCS

Standard and that ESI was using a team and leader that met conditions

precedent § 6.3.3 and § 6.3.7 of ISO 14065 necessary to evaluate whether

Aldabe's project 2 ownership scheme met the VCS Standard. An 18

month hiatus ensued after Round 5 as Aldabe sought a way to close the

final finding related to the validity of an equation used to quantify the

credits.

68. Project 2 PD had listed Palma Efuus SRL as managerial project

proponent.  At the time Palma Efuus SRL was the successor of VCS

Registry Account 1009. To consumate a rush sale of project 1 credits

without any bank accounts, at the time H4 visa holder Aldabe formed in

Belize Palma Efuus LTD on 16 October 2015 to take over account 1009

as Aldabe's agent and as successor to Aldabe's contract with Redd

Services. Like their predecessors, Palma Efuus LTD was also Aldabe's

agent.  He controlled it by proxy through his wife who owned 100% of its

shares and was also its CEO.

69. For consistency and based on project 1 re-verification, Aldabe replaced in Round 6 the managerial project proponent with the new account 1009 holder, now Palma Efuus LTD, without signing any contracts and relying instead on the successorship clause of his contract with Redd Services, as he had done before with Palma Efuus SRL.

70. As a result of a cut and paste (systematically replacing SRL with LTD), the PD now had a typo suggesting that Palma Efuus LTD which was formed only on 16 October 2015 traveled back in time to 5 July 2012 to beat Palma Efuus SRL (which ESI never identified as *deforestation agent*) to buy project 2 site from Lazo Holkon, the only deforestation agent identified in the PD.

71. On 26 January 2016 ESI offered to continue with the validation limiting its scope to the last finding and any new updated criteria. Aldabe  emailed ESI on 15 January 2016 that he understood updated criteria to mean those items listed in the revision history that came into effect during the 18 month hiatus.

72. On March 2016, ESI closed the last finding but issued an incomplete Round 6 which went beyond the agreed scope.  ESI also advised Aldabe that ESI needed to carry out a new full validation as a result of a *tightening* of the VCS Standard nowhere to be found in the VCS revision

histories.  Aldabe sought to get ESI to issue a complete report as it had always done before.

73. On 16 May 2016, in a final attempt to get ESI to issue a complete Round 6, Aldabe submitted responses as he had done so the day after he received Round 6.  The PD continued to state:  "Ownership 1. Right of use arising by virtue of a contractual right in the land.  2. A right of use arising under law."  Three  days later ESI refused to issue a complete Round 6 report.

74. On 26 May 2016, ESI notified Aldabe that it would no longer meet conditions precedents regarding impartiality if Aldabe filed a lawsuit. ESI would confirm it lacked impartiality on 7 November 2016 and 3 February 2017 after Aldabe filed for injunctive relief on 27 May 2016 in Massachusetts Superior Court.

75. Aldabe sought but failed to hire a replacement for ESI.  None wanted the legal risk; Rain Forest Alliance confirming § 5.3.4 did not allow it and that Aldabe had to finish with ESI.

76. ESI issued Round 7 on 1 August 2016 without meeting conditions precedent regarding impartiality.  The report lacks the words *right of use,* a § 3.11.1 finding or a finding 68. By omission, the Round 7 report represented to Aldabe that his ownership scheme met the VCS Standard even when ESI was biased against Aldabe.  In particular he relied on the finding under § 3.7.1 (project start date, which makes reference to §

3.11.1) where ESI states: "The previous finding for this item stated that "**Land Registry La Palma 1.jpg**" shows: "escrit pub. nro 324 de 05/07/2012". That is short for public scripture number 324 of 05/07/2012 which is equivalent **to a sales agreement**. It is the VVB's understanding that in fact the project start date is based on **purchasing land from the deforestation agent** for the first instance. This needs to be made more explicit in Section 1.5 of the PD." ESI had asked Aldabe to do so long ago, in the appendix, where it states: "The project proponent bought in 5 July 2012 Instance 1, La Palma, (having 1693.870has), which is part of the land that was the object of the deforestation permit request made by the deforestation agent. As shown by the INRA Transfer Certificate, Esperanza was is left with the balance. Of 9047.3070has minus 1693.870has."

77. Aldabe relied on these representations to conclude that his project 1 and project 2 ownership schemes met the VCS Standard and that ESI was using a team and leader that met conditions precedent § 6.3.3 and § 6.3.7 of ISO 14065 necessary to evaluate whether Aldabe's project 2 ownership scheme met the VCS Standard.

78. Later, on May 2020 ESI discovered project 2 rubric showing ESI's Pinjuv had closed criteria § 3.11.1 based on this sales agreement. Consistent with project 1 re-verification, ESI accepted Palma Efuus SRL (Bolivia) land

title as sufficient documentary evidence to show that Palma Efuus LTD (Belize) had the right of use.  Principal Aldabe was the only link between his companies known to ESI.

79. Aldabe relied on these representations to conclude that his ownership scheme met the VCS Standard and that ESI was using a team and leader that met conditions precedent § 6.3.3 and § 6.3.7 of ISO 14065 necessary to evaluate whether Aldabe's project 2 ownership scheme met the VCS Standard.

80. Before issuing Round 7, on or about June 2016, Insurer's agent directed ESI to make the project go away so as to deny him of his bargain and avoid VCSA scrutiny. In turn, ESI directed Jaeschke to validate Round 7 and use it to make the project go away by issuing as many findings as possible in order to delay and run the clock to 1 August 2017.  Jaeschke was not approved under the contract to validate project 2 and lacked any experience in validation.

81. To make project 2 go away, Jaeschke took Aldabe's spreadsheets and modified them to include his calculation which summarized in a pivot table the tree dry weights in each of Aldabe's 10 sampling plots.  These are key measure to determine the number of credits and the buffer VCSA will withhold due to measurement uncertainty (which the PD promised to be %15).  Jaeschke then knowingly modified Aldabe's measurements and

refreshed the pivot table which today summarizes materially altered average tree dry weights per plot as well as their standard deviation which now reads about 34% at 95% confidence level rather than below %15 as ESI had confirmed in Rounds 1 to 5.  Jaeschke then put back Aldabe's field measurements (tree diameters) without refreshing the pivot table to portray materially altered averages and standard deviation while giving the superficial appearance that Aldabe's measurements were producing the results in the pivot table.  Jaeschke did so knowing litigation with Aldabe was ensuing.

82. When the pivot table is refreshed, Jaeschke's calculation match the calculations Aldabe submitted to ESI.  These were always clones of his project 1 calculations which ESI had systematically vetted and approved starting on 26 March 2012 when it certified project 1.

83. Both Pinjuv (VCS listed Expert, BA Physics), and team leader McMahon knew those calculations were forged because they reviewed them prior to sending them to Aldabe.  So too C Sellers who reviewed Round 7 as senior internal reviewer.  All of which had an additional duty to check because they knew that Jaeschke was not allowed under the contract to validate project 2 because he lacked validation experience and in particular experience with Aldabe's ownership scheme.  McMahon had

further duty as team leader, under § 6.3.7 of ISO 14065 incorporated into both contracts.

84. In Round 7 Finding 98, ESI represented to Aldabe that validation was being denied only because ESI had taken the liberty to review Aldabe's calculation and found them incorrect.  It did so based on Jaeschke's forgery known to and directed by Insurer, through its agents, through McMahon and Pinjuv who was Jaeschke's immediate boss.

85. Aldabe relied on these representations to conclude that his ownership scheme met the VCS Standard and that ESI was using a team and leader that met conditions precedent § 6.3.3 and § 6.3.7 of ISO 14065 necessary to evaluate whether Aldabe's project 2 ownership scheme met the VCS Standard.

86. Jaeschke, who lacked validation experience and was directed to set a new VCS record for a project with most findings, opened a § 5.2.3 finding which was reviewed by team leader McMahon.

87. ESI's § 5.2.3 finding which explicitly cites the text in § 5.2.3 further states:  "The VVB located listing of this project on the VCS project webpage (http://www.vcsprojectdatabase.org/#/**pipeline**_details/PL999) following this requirement. However, the project proponent listed on the VCS website "Redd Services" and based in Singapore differs from the project proponent reported in PD Section 1.3 "Palma Efuus Ltd" based in

Belize. [Clarification Request]: Please address the findings and **provide verifiable evidence (documentary or similar) to confirm which is the correct project proponent**. Please ensure the same project proponent listed on the VCS website is also reported in the PD. In responding to this finding, please indicate the location of revisions (if any) to the PD or the VCS"

88. The VCS Standard is silent about its website regarding validation.  But said website still contains an unsigned listing representation and the original PD which Aldabe submitted to the VCS Registry to get the pipeline registration rolling and which it later incorrectly uploaded it to the website.  The unsigned listing representation lists Redd Services Pte Ltd.

89. McMahon knew or should have known it was an improper finding because: 1) it is a condition precedent to validation being raised in Round 7 of validation, 2) in March 2013, McMahon had directed McMorrow to grandfather by holding the meeting prior to it coming into effect, 3) it lies under § 5 of the VCS Standard v3.5 (Validation and Verification Requirements) instead of § 3 (Project Requirements), 4) the words *right of use* appear only in § 3 and in the revision history of the VCS Standard, 5) the VCS Registration and Issuance Process, incorporated into the contract, prescribes that Aldabe's ownership scheme is to be evaluated

only during validation (§ 4.1), but not during pipeline registration (§ 3.1) which only requires submitting to the VCS Registry: a) a PD describing his ownership scheme, b) his contract with ESI and c) a self declaration requiring only a single signature by Aldabe or his agents and 6) it is not clearly communicate that it is reopening findings about Aldabe's ownership scheme or specifying which documentary evidence no longer meets the VCS Standard; something that ESI had a duty to clearly communicate to Aldabe under both contracts, given that both projects had the same ownership scheme based on real *control*.

90. ESI's rubric discovered on May 2020 shows that § 5.2.3 finding was raised by Jaeschke on 30 June 2016.  In his deposition in December 2022, Jaeschke's confirmed that Aldabe's ownership scheme was possible but that he lacked the expertise to evaluate such documentary evidence.

91. Condition precedent § 5.2.3, which did not apply to project 2 was a condition precedent to issuing any Rounds.  It required Aldabe to make compatible the listing representation in the VCS website with that stated in the project 2 description.  But left it to Aldabe, as allowed under the contract, to put any entity or individual including himself.  But only if ESI found it consistent with the § 3.11.1 documentary evidence which

Aldabe could draft to ESI's satisfaction[8] starting from his agent Palma

Efuus SRL which ESI had already found owned the credits.

92. Aldabe could have closed § 5.2.3 finding by reminding ESI that project 2

was grandfathered or amending the PD and listing representation to list

Aldabe instead of Palma Efuus LTD.

93. On 7 November 2016, McMahon signed an affidavit which she knew

would be filed in US District Court for Massachusetts (Case 1:16-cv-

11067-MLW) between Aldabe and ESI. On 3 February 2017 she filed a

second affidavit in said Court and on 10 June 2021 she further signed one

she knew would be filed in Duval Court (Case 16-2018-CA-001258).

94. These affidavits do not mention Aldabe's agents Redd Services, Palma

Efuus SRL nor Palma Efuus LTD.  None of the three affidavits mention

that Aldabe had failed to submit documentation to assert his right to the

credits.  Having the possibility to so argue in the last two affidavits,

McMahon chose instead to make assertions regarding project 2

calculation that McMahon knew were based on Jaeschke's forged

calculation.

95. On or about April 2019, Aster Global Environmental Solutions Inc

acquired ESI's ISO 14065 license to certify projects and ESI's rights and

obligations under all contracts listed in annex B of an APA.  It is

---

8  Had ESI addressed its loss of impartiality on 27 May 2016 by hiring an impartial
consultant.

unknown at this time whether Aldabe's projects are listed in said annex.

Shortly after VCSA listed Aster in its website as the new VVB to both

projects. Only Aster had the necessary ISO 14065 license to trigger

project 1 Task 4 (until 2041) and project 2 Task 3 (until 2042).

96. Starting in December 2011, ESI interviewed its employees prior to hiring

them. ESI vetted McMahon to appoint her ESI's vice president for its

Carbon Forestry Division. ESI knew or should have known whether the

teams and their leaders lacked the legal expertise, the Spanish language

expertise and other expertise and competencies required under §§ 6.3.3

and 6.3.7 of ISO 14065 to evaluate whether an ownership scheme met §

3.11.1 (right of use) of the VCS Standard. For the same reasons, ESI also

knew or should have known they lacked training and experience applying

said expertise. Specifically, ESI's McMahon knew or should have known

she lacked said expertise and competencies because McMahon always

listed herself as team leader. But ESI knew or should have known as well

from two VCSA listed VCS Experts that formed the team, McMahon's

husband and S Ruddell, that the team, including McMorrow (actual

validator) and McMahon (team leader) lacked said expertise and

competencies. These experts knew or should have known as VCSA listed

Experts that they also lacked the same expertise and competencies.

97. Starting on June 2016 and until 10 August 2023, ESI made several representations to Aldabe as a result of his queries about ESI's expertise and competencies regarding the quantification of GHG emission reductions (§ 8 VCS Redd Module v1.5)[9].  ESI responded when it knew or should have known that as a matter of law Aldabe was not the project proponent or owned the credits:

    a.  Between June 2016 and August 2016 during several phone conversations attempting to avoid litigation, ESI's counsel represented to Aldabe that ESI had complied at all project 2 times with the VCS Standard and the contract regarding §§ 6.3.3 and 6.3.7 of ISO 14065.

    b.  Between September 2016 and April 2019 ESI represented to Aldabe through its website[10] that McMahon was the Regional Technical Manager for the Forestry, Carbon and GHG Services Division of ESI, with over 12 years of experience.  While ESI's successor before the VCSA regarding Aldabe's projects, represented  to Aldabe through its website[11] between on August 2020 and 10 August 2023 that it had more than 24 year of experience in GHG validations/verifications.

    c.  On 7 November 2016 through team leaders' affidavit filed in Massachusetts Federal District Court ESI represented without

---

9  But not those regarding project 2 boundaries which include geographical boundary determined by the land title (§ 5.1 VCS Redd Module v 1.5).

10  http://www.esinc.cc/Environmental-Services-Inc/janice-p-mcmahon.html

11  https://www.asterglobal.com/meet-the-team/janice-mcmahon/

mentioning any of Aldabe's agents or proxy: "**plaintiff's project**" at ¶¶ 9, 11 (twice), 21, 22 and 44.   While at ¶ 45 it states: "**Plaintiff is not irreparably harmed**. If Plaintiff simply took the steps he needed to take, made timely payments, and responded to the validly issued NCRs, **he could get his project validated by July 2017**. At this point, **however he will need to do so with a different VVB given this litigation and the conflict of interest it causes with ESI continuing.**"

d.  On 3 February 2017 through team leaders' affidavit filed in Massachusetts Federal District Court ESI represented without mentioning any of Aldabe's agents: At page 5 ¶ 12 "With respect to **Plaintiff's Project** [2]...ESI made a site visit to Bolivia for **Plaintiff's Project** from April 5-13, 2013".  At page 7 ¶ 21 "no aspect of **Plaintiff's Project**".   At page 8, ¶ 24 "ongoing **projects like the Plaintiff's**... Accordingly, **Plaintiff's project** was now".  At page 16 ¶ 50: "that if **Plaintiff's project** is validated,".  At page 18 ¶ 56: "respect to the **Plaintiff's Project**,".  At page 19 ¶ 60: "how many carbon credits **Plaintiff's Project** would yield", at page 5 ¶ 13 it states: "If a **project proponent such as the Plaintiff**" . At page 7 ¶ 23: "As the **Project proponent**, it was incumbent upon **Plaintiff**", at page 16 ¶ 49: "Generally, **when a project proponent wishes to**

**discharge one VVB** and retain another mid-project, the discharged VVB must issue a negative report concerning the project which has **potential harmful implications for the project proponent**. In this case, in an effort to try to assist **Plaintiff** with the Project, ESI approached VCS in June of 2016 and obtained VCS' approval for Plaintiff to retain another VVB without being penalized so he could continue on with the Project. **Plaintiff has apparently refused to do so"**. At page 17 ¶ 53: "In **projects similar to Plaintiff's**, **proponents have done** anywhere from 500 to 1000 samplings of the project area, which would lead to higher confidence in the carbon inventory and thus a lower deduction. **Plaintiff has done** ten (10) such samplings. As a result, a large confidence deduction is necessary which **Plaintiff has not done**."  At page 17 ¶ 55: "it is not clear what the **project proponent** is planning to do and whether it is reproducible.". At page 18 ¶ 57: "**Plaintiff is not irreparably harmed**. If Plaintiff simply took the steps he needed to take, made timely payments, and responded to the validly issued NCRs, **he could get his project validated by July 2017**. At this point, **however he will need to do so with a different VVB given this litigation and the conflict of interest it causes with ESI continuing.**"

e. On 23 April 2018, Aldabe filed in Duval Court the Motion to Notify Defendants Janice P McMahon, Shawn McMahon And Guy Pinjuv Of Existence of [Insurer's agent] Conflict of Interest (D24).  Aldabe pleaded conflict between ESI's counsel and ESI's employees in an attempt to make offer which required ESI's team leads and leader to acknowledge culpability "if or when such culpability exists".  Aldabe, conferred with Insurer's agent, ESI's counsel, regarding whether some team members "do not fulfill their respective claims over the period 2012-2018".  ESI' counsel, A Ferguson, replied on 15 May 2018 stating: "we dispute the existence of any conflict".

f. Between April 2019 and 10 August 2023, when Ohio based Aster Global Environmental Solutions Inc (**Aster**), the VCSA's listed VVB for project 1 and project 2, did not raise any finding questioning Aldabe's project 1 and project 2 ownership schemes.

g. On 27 September 2019 ESI filed the 17th affirmative defenses (D58) where it states: "[ESI] committed no error or omission that caused [Aldabe]'s alleged injury."   ESI also filed the 25th  affirmative defense (D58) stating: "Defendant states that Plaintiff is not the real party in interest to any damages claim and as such is barred from recovery, **as the real party in interest may be Palma Efuus Ltd.**, the proponent of the Project, and thus the entity that would be entitled to the benefit

of the sale of any carbon credits, and any purported agreement that
Plaintiff may have had with Palma Efuus to the contrary is barred by
the statute of frauds." Palma Efuus SRL is not mentioned.

h. On May 2020, through discovery, when ESI delivered to Aldabe its
project 1 and project 2 rubrics without retracting any § 3.11.1 finding
or equivalents. ESI had found in both projects that a land title in favor
of Palma Efuus SRL complies with § 3.11.1.  Specifically that in
project 2 Palma Efuus Ltd derived its ownership from Palma Efuus
SRL through Aldabe.

i. On 22 June 2020 ESI represented to Aldabe in its now 15th affirmative
defense (D67): "[ESI] committed no error or omission that caused
[Aldabe]'s alleged injury insofar as it complied with the VCS Standard
and Guidelines, complied with the original contract… as amended in
January 2016."

j. On 10 June 2021 through team leaders' affidavit filed in Duval Circuit
Court ESI represented without mentioning any of Aldabe's agents: At
page 6 ¶15: "If a **project proponent** such as the **Plaintiff**", page 10
¶31: "As the **Project proponent, Plaintiff** was required", page 16,
¶55: "what is more odd is a **project proponent** abandoning a project
for two years as **Plaintiff** did in this case.". At page 20 ¶63 "In
**projects similar to Plaintiff's**, **proponents** have ".  At page 3 ¶6 "As

a result, almost every GHG **project** being developed, and particularly ones like **Plaintiff's**,". At page 3 8: "At all times relevant to **Plaintiff's Project**,". At page 4 ¶ 9: "In this case, **Plaintiff's project** started in July 2012," and "As such, **Plaintiff's project** needed to be validated by the end of July 2017.".  At page 5 ¶ 14: "With respect to the **Plaintiff's Project**," and "ESI then made a site visit to Bolivia for **Plaintiff's Project** from April 5-13, 2013." At page 9 ¶ 29 "no aspect of **Plaintiff's Project**". At page 10 32: "**Plaintiff's project** was now subject,".  At page 22 ¶ 67: "VCS, who is the ultimate decision-maker with respect to the **Plaintiff's Project**," and at page 22 ¶ 68: "**if Plaintiff simply took the steps he needed** to take and responded to the validly issued NCRs, he would have been able to get his project validated well before the July 2017 deadline and **[he] would not have suffered any harm.**"

k.  On 1 December 2022 (in it first MSJ (D344), pg 2): "Furthermore, Plaintiff cannot prevail because the failure of the Project to meet the deadline of July 2017 **was solely due to his own failure and breach**."

l.  On 1 December 2022 (in it first MSJ (D344), pg 14):  "ESI is Entitled to Summary Judgment as Plaintiff Lacks standing since **Palma Efuus Ltd**, not Plaintiff, **is the Real Party in Interest**, and any Claim of

Plaintiff is Barred by the Statute of Frauds." Insurer and ESI pleaded

so knowing finding 68.

98. Aldabe relied on these representations up and until 10 August 2023 to

conclude that his project 1 and project 2 ownership schemes derived from

Palma Efuus SRL (not LTD) met the VCS Standard and that ESI had at

all times used a team and leader that met conditions precedent §§ 6.3.3

and 6.3.7 of ISO 14065 necessary to evaluate whether Aldabe's project 2

ownership scheme met the VCS Standard.

99. But on 10 August 2023 ESI amended its motion for summary judgement

(D494). It states at pg 18 : **"Indeed, Plaintiff did not submit sufficient**

**documentation during the Project establishing that he, Palma Efuus**

**Ltd or Palma Efuus SRL had any sustainable legal claim to the**

**credits or proceeds from the sale of any credits….ESI is Entitled to**

**Summary Judgment as Plaintiff Failed to Establish that He, Palma**

**Efuus Ltd. or Palm Efuus SRL had the Proof of Right or Right of Use**

**to Any Credits Resulting from the Project…However, Plaintiff's**

**Project documents and submittals to ESI failed to establish that**

**Palma Efuus Ltd or, for that matter, any entity, had the Proof of**

**Right or Right of Use for this Project."** Insurer and ESI knew or should

have known under Jones v Niagara that this allegation was not supported

in fact given finding 68 and project 1 precedents.   The Duval Court

agreed with ESI and dismissed the complaint.

100.      ESI failed to meet it duty to notify because it failed to explain why

Aldabe's project 1 and project 2 ownership scheme derived from Palma

Efuus SRL did not meet the VCS Standard.  ESI has not done so to avoid

present litigation sustained on ESI's teams and leaders lack of the

requisites under §§ 6.3.3 and 6.3.7 of ISO 14065 needed to evaluate

Aldabe's ownership schemes since 8 December 2011.

101.      Under the contracts, ESI owed Aldabe duty to notify him of any

changes to his projects.  Between June 2016 and 10 August 2023, Insurer

intentionally directed ESI, directly or through agents (ESI's counsel and

ESI's own agent), to cut all communications with Aldabe unless directed

otherwise in order to advance Insurer's legal strategy.  Insurer also

intentionally directed ESI to breach §§3.3, §§ 4.5, 7.1 of ISO 14065 and §

3.3.2 of the Validation and Verification Manual and conceal instead of

notifying it had acted in breach of §§ 6.3.3 and 6.3.7 of ISO 14065 and

had failed to properly evaluate his ownership scheme (¶ 97 above).

Specifically on or about September 2016 after Aldabe notified ESI's

counsel through his federally appointed counsel about the degree and

breath of Round 7 findings. But also as part of its legal strategy, each time

ESI hired its experts (a total of 6, if not 7) which reviewed ESI's project 2

performance.  As well, as part of ESI's counsel ethical due diligence

described in Jones v Niagara, on or about 7 November 2016, 3 February

2017, 10 June 2021 when ESI filed affidavits or on 27 September 2019,

27 April 2020, 22 June 2020 when ESI pleaded affirmative defenses

which dealt with Aldabe's ownership scheme.

## PROCEDURAL BACKGROUND

102.     After ESI repeatedly refused to issue a full Round 6 project 2

report, Aldabe filed for injunctive relief against ESI in the Middlesex

County Superior Court in Massachusetts on 27 May 2016.  ESI removed

the case to US District Court in Boston (Case 1:16-cv-11067-MLW).

Aldabe enjoined VCSA and ANSI.  The case was dismissed without

prejudice against ESI for lack of jurisdiction on 20 September 2017 and

shortly afterwards the case was dismissed against the other two for lack

of prosecution.

103.     Aldabe filed a complaint in Duval Circuit Court on 27 February

2018 against ESI and some team members (Case 16-2018-CA-001258).

The complaint against the team members was dismissed without

prejudice because they had only acted as employees.

104.     In the amended motion for summary judgment (D494) and/or during its hearing ESI pleaded the following to intentionally deceive the Duval Court:

a.  That Aldabe had failed to submit documentary evidence proving Palma Efuus LTD was the project proponent.  ESI did so knowing it closed such finding in Round 7.

b.  That Aldabe had failed to submit documentary evidence proving Palma Efuus SRL was the project proponent.  ESI did so knowing it closed such finding in Round 2.

c.  That Aldabe had failed to submit documentary evidence proving Aldabe was the project proponent.  ESI did so knowing Aldabe had submitted the shareholder certificate prior to validation and that ESI had found Aldabe was the project proponent and owned the project and credits; something confirmed across 3 affidavits filed by ESI's team leader.  ESI did so knowing that Aldabe had worked on the project in all the capacities that the contract identifies as those of stakeholders, that parties expectation at the time of signing was that Aldabe owned the project and would own the credits once verified.

d.  That Aldabe had refused to respond to Round 7. ESI did so knowing that it no longer met the conditions precedent of impartiality prior to issuing Round 7, had recused on that ground on 7 November 2016.

ESI also knew that the unambiguous and plain language of § 5.3.4 of the VCS Standard prohibited Aldabe finishing with some other VVB; something it knew Rain Forest Alliance had confirmed.

e. That the ownership scheme is governed by § 5.2.3.  ESI did so knowing that § 5.2.3 is a condition precedent to validation, that the ownership scheme (right of use) is evaluated during validation under § 3.11.1 instead of under § 5.2.3 and that McMahon had personally addressed it back in 2013 by grandfathering the project under § 5.2.3.

f. That *documentary evidence* in § 3.11.1 is limited to written contracts. ESI did so knowing that VCSA stated during deposition that it gives ESI sole authority and immense latitude to evaluate any type of documents.

g. That Aldabe had no written contract with Palma Efuus LTD.  ESI did so knowing that Aldabe had an agreement with the VCS Registry account 1009 holder, at the time Palma Efuus LTD which covered project 2 and future projects to receive $10/credit delivered to any VCS Registry.

h. That Aldabe's contract with ESI was for the delivery of credits instead of credits. ESI did so knowing that the contract is for certificates fungible into credits.

i.   That Aldabe was not the beneficiary of the project 2 certificates and policy.  ESI did so knowing it the contract made Aldabe sole beneficiary to both.

j.   That Aldabe did not own the credits because to transact credits Aldabe had to go through third parties.  ESI did so knowing said parties were his agents/brokers.

k.   That Aldabe's contract with Palma Efuus LTD fell within the Statute of Frauds. ESI did so knowing it was not a party to the litigation.

l.   That ESI was not sole arbitrator to evaluate whether the ownership scheme met the VCS Standard and that it should be *learned* persons without ISO 14065 certification to determine this issue at law rather than industry practice.  ESI did so knowing that under the contract ESI was the sole arbitrator to said question.

m.  That the Court could disregard parties contractual expectations at the time of signing and add/delete words where terms are unambiguous.

n.   That Aldabe had received fair notice of the defense that Aldabe's ownership scheme derived from Palma Efuus SRL did not meet § 3.11.1 of the VCS Standard.

105.    On 17 August 2023, the Duval Court dismissed Aldabe's another attempt to amend his complaint which he filed before 10 August 2023.

Making it clear to Aldabe that pleadings were closed.  During the hearing

and to no avail Aldabe argued lack of fair notice.

106.    At ¶ 2 of his opposition filed in Duval Court, Aldabe copied and

pasted ESI's finding 68 setting the VCS criteria: "VCS [carbon forestry

main document] v1.3, a. All Activity Types - **Project proponents must**

**be able to show control over the project area and ownership of**

**carbon rights for the project area** at the time of **verification**." It was

closed on 20 September 2013 in light of § 3.11.1.2 (Right at Law) stating:

"**Ownership transfer documents reviewed**. **Palma Efuus SRL clearly**

**owns this property**. **Issue addressed**."

107.    Despite being conspicuously copied and pasted and critical text

highlighted in neon yellow, making it impossible to miss, and Aldabe

confirming during the hearing that the Court had read Aldabe's pleadings,

the Court found otherwise and dismissed the complaint through a 2 page

memo directing ESI to draft the order (Annex C and D hereto

incorporated into this complaint).

108.    Said order puts into question every carbon project under the VCS

Standard which relies on a land title to prove ownership of the credits.

109.    On 21 March 2022 Aldabe filed a derivative suit before this Court

(case #3:2022cv00326) against ESI and two companies related to ESI and

a direct suit against said related companies.  That case was dismissed
without prejudice.

110.    Aldabe also refiled the complaint against ESI's employees ( Case
16-2023-CA-000138-XXXX-MA) on 9 January 2023 now for breaches
of duty they owed Aldabe as team and leader under ISO 14065 and which
they agreed to perform by conduct knowing of said duty.  Despite the
Duval Court cover sheet, it was randomly assigned to Judge Feltel who
dismissed the complaint without prejudice for lack of prosecution shortly
after dismissal of the case before Judge Wallace.

111.    During the Duval proceedings, ESI identified emails containing
ESI's instruction to Jaeschke to make the project go away as protected
under the work product doctrine. The Duval Court agreed, despite Aldabe
pleading precedents from the US Federal Courts regarding requisites to
invoke the common interest doctrine.

112.    ESI's former co-defendant VCSA, which had/has a lot more
reputation and business to lose than ESI, gave pecuniary benefit to
Aldabe's expert in exchange for open-ended employment to restore faith
in the media battered VCS Standard.  But only after learning that the
expert was siding with Aldabe regarding ESI's conduct, technical skills
and validity of his ownership scheme.   Thereafter the expert refused to
put further statements in the form of an affidavit after having agreed to do

so prior to being hired by VCSA, but reiterated he stood by his signed affidavits. During his second deposition, the expert recanted the validity of Aldabe's ownership scheme despite what he drafted in his affidavit.

113.    During the last case management hearing Aldabe told the Duval Court that ESI had pleaded before this Court that the documents were sufficient in project 1 but not in project 2; the Duval Court stated ESI was precluded from doing so under the doctrine of estoppel.  The hearing was not recorded.

114.    During a motion for fees and costs ESI argued that it is not a Constitutional conflict when a State Court assigns attorney's fees and costs. Even though Aldabe pleaded that the settlement offer required him to relinquish his Federal litigation without the supervision of the Federal Court. The Duval Court agreed with ESI and ordered Aldabe to pay ESI $288,417.88 in attorney's fees and costs.

## COUNTS

## COUNT I: PROJECT 1 AND PROJECT 2 BREACH OF CONTRACT BY ESI

115.    Aldabe incorporates the paragraphs above.  Specifically, ¶¶ 96, 97, 101.

116.     Between June 2016 and 10 August 2023, Insurer intentionally

directed ESI to stop communicating with Aldabe and to breach §§3.3, §§

4.5, 7.1 of ISO 14065 and § 3.3.2 of the Validation and Verification

Manual.  ESI accommodated Insurer and concealed from Aldabe during

that entire period that: 1) the contracts were at all times incapable of

performance, 2) that his projects 1 and 2 documentary evidence no longer

met § 3.11.1 (right of use) and 3) ESI's team and leader lacked at all

times conditions precedent under §§ 6.3.3 and 6.3.7 of the ISO 14065

needed to evaluate Aldabe's ownership scheme.

117.     Insurer directed ESI to do so in order to avoid further (present)

litigation from Aldabe and to avoid VCSA scrutiny that could bring

litigation from other clients.

118.     It was but for these breaches that Aldabe lost the right to assert

everywhere his ownership to project 1 and project 2 as well as their

credits.  But also the project 1 and 2 certificates fungible into 71,102 and

2,075,371 credits respectively or **$711,020** and **$20,753,710** respectively

at a market value of $10/credit.

119.     Between June and September 2016, Insurer intentionally directed

ESI, directly or through ESI's counsel, to breach §§ 3.3 and 3.4 of ISO

14065. ESI accommodated and fraudulently misrepresented to VCSA that

at all times it had acted with required expertise and competencies and that it had done nothing wrong while putting the blame on Aldabe.

120.    Insurer directed ESI to do so, and ESI agreed, in order to avoid further litigation from Aldabe and to avoid VCSA scrutiny that could bring litigation from other clients.

121.    It was but for these breaches that VCSA cut ties with Aldabe on September 2016.  Despite attempts, Aldabe was unable to recompose his contractual and business relationships with VCSA. As a result Aldabe was unable to continue to certify at least 5 project 2 clones or **$103,768,550**.

122.    It was but for all of these breaches by ESI that Aldabe also wasted 5 years of his life validating projects under contracts incapable of performance. All because ESI did not meet conditions precedent needed to evaluate ownership of the projects and creduts. As a result, he also wasted another 7 years litigating across several jurisdictions.  Effectively, wasting an average of 20 hours/year across 12 years or **$3,120,000** at an hourly rate of $250. He further acquired a liability in attorney's fees and costs of **$288,417.88** which he cannot pay because he is effectively bankrupt as a result of ESI's conduct.

123.    WHEREFORE, Plaintiff respectfully requests that the Court grant relief to Aldabe and order that: A) ESI pay Aldabe for the value of the project 1 certificates.  Equivalently fungible into $10/credit for each of

the 71,102 project 1 credits ESI verified or equal to $711,020. B) ESI pay

Aldabe for the value of the project 2 certificates.  Equivalently fungible

into  $10/credit for each of the 2,075,371 project 2 credits ESI refused to

verify in Round 4 despite VCSA guidance to ESI supporting verification

or equal to $20,753,710. C) ESI pay Aldabe the sum of $103,768,550 for

his lost business conservatively[12] estimated to be 5 times project 1. D)

ESI pay Aldabe the sum of $3,120,000 for his time sunk into the

certification and litigation. E) ESI pay on behalf of Aldabe the

$288,417.88 that Duval Court ordered Aldabe pay to ESI for attorney's

fees and costs. F) Aldabe reimburse all his clients all credits he sold at a

replacement value of $10/credit.


## COUNT II: TORTIOUS INTERFERENCE BY INSURER IN ALDABE'S CONTRACTUAL RELATIONSHIP WITH ESI AND VCSA

124.     Aldabe incorporates the paragraphs above.  Specifically, ¶¶ 96, 97,

   101.

125.     On or about June 2016 Insurer knew or should have known through

   its agents (ESI's counsel) that ESI had two contractual relationships

   (project 1 and 2 contracts) with Aldabe.  It also knew because Aldabe

---

12  Aldabe was cranking projects at 1 per year.

shared with Insurer's agent between June and August 2016 that the

projects were carbon copies of each other.

126.    Between June 2016 and 10 August 2023, Insurer intentionally

directed ESI to stop communicating with Aldabe and to breach §§3.3, §§

4.5, 7.1 of ISO 14065 and § 3.3.2 of the Validation and Verification

Manual.  ESI accommodated Insurer and concealed from Aldabe during

that entire period that: 1) the contracts were at all times incapable of

performance, 2) that his projects 1 and 2 documentary evidence no longer

met § 3.11.1 (right of use), 3) ESI's team and leader lacked at all times

conditions precedent under §§ 6.3.3 and 6.3.7 of the ISO 14065 needed to

evaluate Aldabe's ownership scheme.

127.    Insurer directed ESI to do so in order to avoid further (present)

litigation from Aldabe and to avoid VCSA scrutiny that could bring

litigation from other clients.

128.    It was but for said tortious interference by Insurer that Aldabe lost

the right to assert everywhere his ownership to project 1 and project 2 as

well as their credits.  But also the project 1 and 2 certificates fungible into

71,102 and 2,075,371 credits respectively or **$711,020** and **$20,753,710**

respectively at a market value of $10/credit.

129.    On or about June 2016 Insurer knew or should have known through its agents (ESI's counsel) that Aldabe had a contractual (project 1) and a business (project 2) relationship with VCSA.

130.    Between June and September 2016, Insurer intentionally directed ESI, directly or through ESI's counsel, to breach §§ 3.3 and 3.4 of ISO 14065. ESI accommodated and fraudulently misrepresent to VCSA that all times it had acted with required the expertise and competencies and that it had done nothing wrong while putting the blame on Aldabe.

131.    Insurer directed ESI to do so, and ESI agreed, in order to avoid further litigation from Aldabe and to avoid VCSA scrutiny that could bring litigation from other clients.

132.    It was but for said tortious interference by Insurer that VCSA cut ties with Aldabe on September 2016.  Despite attempts, Aldabe was unable to recompose his contractual and business relationships with VCSA.  As a result Aldabe was unable to continue to certify at least 5 project 2 clones or **$103,768,550**.

133.    It was but for all of the above tortious interference by Insurer that Aldabe also wasted 5 years of his life validating projects under contracts incapable of performance. All because ESI did not meet conditions precedent to evaluate the most critical aspect of his projects. As a result, he also wasted another 7 years litigating across several jurisdictions.

Effectively, wasting an average of 20 hours/year across 12 years or **$3,120,000** at an hourly rate of $250. He further acquired a liability in attorney's fees and costs of **$288,417.88** which he cannot pay because he is effectively bankrupt as a result of Insurer's conduct.

134.     WHEREFORE, Plaintiff respectfully requests that the Court grant relief to Aldabe and order that: A) Insurer pay Aldabe for the value of the project 1 certificates.  Equivalently fungible into $10/credit for each of the 71,102 project 1 credits ESI verified or equal to $711,020. B) Insurer pay Aldabe for the value of the project 2 certificates.  Equivalently fungible into  $10/credit for each of the 2,075,371 project 2 credits ESI refused to verify in Round 4 despite VCSA guidance to ESI supporting verification or equal to $20,753,710. C) Insurer pay Aldabe the sum of $103,768,550 for his lost business conservatively[13] estimated to be 5 times project 1. D) Insurer pay Aldabe the sum of $3,120,000 for his time sunk into the certification and litigation. E) Insurer pay on behalf of Aldabe the $288,417.88 that Duval Court ordered Aldabe pay to ESI for attorney's fees and costs. F) Aldabe reimburse all his clients all credits he sold at a replacement value of $10/credit.

---

13  Aldabe was cranking projects at 1 per year.

**COUNT III: PROJECT 1 AND PROJECT 2 FRAUDULENT**

**INDUCEMENT BY ESI**

135.     Aldabe incorporates the paragraphs above.  Specifically, ¶¶ 96, 97, 101.

136.     On 8 December 2011 and 9 November 2012 ESI fraudulently induced Aldabe into two contracts, incapable of performance, to certify Aldabe's projects under the VCS Standard. ESI knew or should have known at the time that said offers were incapable of performance.

137.     To perform said contracts, ESI had to be in possession of an ISO 14065 license to certify, a VCS Standard license to certify and under § 8.2 of ISO 14065 a validation team and leader that met §§ 6.3.3 and 6.3.7 of the ISO 14065. Otherwise, Aldabe's bargains, the certificates, are worthless and there is no consideration.

138.     In its offers dated 8 December 2011 and 9 November 2012, ESI listed the team and team leader to validate and verify both projects under the VCS Standard and ISO 14065.

139.     Each time prior to agreeing to terms, Aldabe relied on these representations to conclude that ESI's team and leader met the required conditions precedent § 6.3.3 and § 6.3.7 of ISO 14065 necessary to evaluate whether Aldabe's project 1 and 2 ownership scheme met the VCS Standard. Aldabe also relied on them to concluded that the contracts

were capable of performance (as per § 8.2 of ISO 14065) . As a result,

Aldabe hired ESI to certify his projects.

140.    Each time ESI knew or should have known prior to making said

representations that the contracts were totally incapable of performance

because its employees did not meet conditions precedent § 6.3.3 and §

6.3.7 of ISO 14065 necessary to evaluate whether Aldabe's project 1 and

2 ownership scheme met the VCS Standard. (See ¶¶ 96 above).

141.    ESI made the representations prior to agreeing to project 1 contract

to profit from its certification and gain lacking expertise and

competencies. But also to capture a portion of Aldabe's lucrative future

business across the Amazon. ESI made them prior to agreeing to project

2 contract to avoid litigation for project 1 breaches and VCSA scrutiny

that could trigger litigation by other clients.

142.    Between June 2016 and 10 August 2023, Insurer intentionally

directed ESI to stop communicating with Aldabe and to breach §§3.3, §§

4.5, 7.1 of ISO 14065 and § 3.3.2 of the Validation and Verification

Manual. ESI accommodated Insurer and concealed from Aldabe during

that entire period that: 1) the contracts were at all times incapable of

performance, 2) that his projects 1 and 2 documentary evidence no longer

met § 3.11.1 (right of use), 3) ESI's team and leader lacked conditions

precedent under §§ 6.3.3 and 6.3.7 of the ISO 14065 needed to evaluate

Aldabe's ownership scheme.

143.    As a result of not meeting these conditions precedent, between June

and September 2016, Insurer intentionally directed ESI, directly or

through ESI's counsel, to breach §§ 3.3 and 3.4 of ISO 14065. ESI

accommodated and fraudulently misrepresent to VCSA that all times it

had acted with required the expertise and competencies and that it had

done nothing wrong while putting the blame on Aldabe.

144.    It was but for ESI's fraudulent inducement into 2 contracts

incapable of performance that:

a.    Aldabe lost the right to assert everywhere his ownership to project 1

and project 2 as well as their credits.  But also the project 1 and 2

certificates fungible into 71,102 and 2,075,371 credits respectively or

**$711,020** and **$20,753,710** respectively at a market value of

$10/credit.

b.    VCSA cut ties with Aldabe on September 2016.  Despite attempts,

Aldabe was unable to recompose his contractual and business

relationships with VCSA.  As a result Aldabe was unable to continue

to certify at least 5 project 2 clones or **$103,768,550**.

c.    Aldabe also wasted 5 years of his life validating projects under

contracts incapable of performance. All because ESI did not meet

conditions precedent to evaluate the most critical aspect of his projects. As a result, he also wasted another 7 years litigating across several jurisdictions. Effectively, wasting an average of 20 hours/year across 12 years or **$3,120,000** at an hourly rate of $250. He further acquired a liability in attorney's fees and costs of **$288,417.88** which he cannot pay because he is effectively bankrupt as a result of ESI's conduct.

145.    WHEREFORE, Plaintiff respectfully requests that the Court grant relief to Aldabe and order that: A) ESI pay Aldabe for the value of the project 1 certificates.  Equivalently fungible into $10/credit for each of the 71,102 project 1 credits ESI verified or equal to $711,020. B) ESI pay Aldabe for the value of the project 2 certificates.  Equivalently fungible into $10/credit for each of the 2,075,371 project 2 credits ESI refused to verify in Round 4 despite VCSA guidance to ESI supporting verification or equal to $20,753,710. C) ESI pay Aldabe the sum of $103,768,550 for his lost business conservatively[14] estimated to be 5 times project 1. D) ESI pay Aldabe the sum of $3,120,000 for his time sunk into the certification and litigation. E) ESI pay on behalf of Aldabe the $288,417.88 that Duval Court ordered Aldabe pay to ESI for attorney's

---

14  Aldabe was cranking projects at 1 per year.

fees and costs. F) Aldabe reimburse all his clients all credits he sold at a

replacement value of $10/credit.


Respectfully submitted on February 17, 2025,

Fermin Aldabe
/s/ Fermin Aldabe
fermin_aldabe@yahoo.com
(828) 556-2121
678 Line Runner Ridge Rd
Estatoe Township, NC 28772